[No. B182561. Second Dist., Div. One. Dec. 6, 2007.]

RICHARD J. PERRILLO, Plaintiff and Appellant, v.
PICCO & PRESLEY et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts IIB. through IIE.

916

918

## Counsel

Cassinat Law Corporation, John E. Cassinat; Lopez, Hodes, Restaino, Milman & Skikos and Mark G. Crawford for Plaintiff and Appellant.

Breidenbach, Huchting & Hamblet, Eugene J. Egan; Greines, Martin, Stein & Richland, Kent L. Richland, Laura Boudreau and Jeffrey E. Raskin for Defendants and Appellants Picco & Presley, Gregory Picco and Margaret Presley.

Carroll, Kelly, Trotter, Franzen & McKenna, Richard D. Carroll and David P. Pruett for Defendant and Appellant Joseph J. Iacopino.

## Opinion

**MALLANO, Acting P. J.**—Employees who are injured in the course of employment are typically barred by the exclusive remedy doctrine from suing their employer for the injury and are limited to workers' compensation. (Lab. Code, §§ 3600, subd. (a), 3602; section references are to the Labor Code unless otherwise indicated.) The employees may, however, bring a civil suit against any person other than their employer who proximately caused the injury. (§ 3852.)

Here, the employees pursued relief in both forums: They filed individual workers' compensation cases and together brought a civil suit against a third party. The employees' attorneys retained a psychologist as an expert. He wanted to be paid in advance. Instead, the attorneys agreed to pay him from the recovery in the civil suit. The psychologist evaluated the employees. He filed his bills in the workers' compensation cases. The employers' carriers made payments on some of the bills.

The civil suit settled. The psychologist expected to receive the unpaid balance on his bills, but the attorneys refused to pay, asserting that the exclusive remedy doctrine barred payment out of the settlement. The psychologist then withdrew his remaining bills from the workers' compensation cases and filed this action against the attorneys, seeking payment for his services. A jury found in his favor. We reverse, concluding that, because the psychologist's work was compensable through the workers' compensation system, he had no right to payment in the civil suit.

# I

# BACKGROUND

The following facts are taken primarily from the evidence presented at trial, viewed in the light most favorable to the prevailing party. (See *Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133].)

In 1996, several individuals filed suit against Bechtel Group, alleging that while working as employees of other companies, they had sustained injuries at Elk Hills Naval Petroleum Reserve No. 1 (Elk Hills) due to Bechtel's toxic contamination of the site (*Fanska v. Bechtel Group* (Super. Ct. S.F. City & County, 1996, No. 975205) (*Bechtel* suit)). Some of the employees' wives joined in the *Bechtel* suit, alleging claims for loss of consortium. The employees and wives (collectively, *Bechtel* plaintiffs) were represented by Gregory Picco and Eileen McGruder, with the firm of Picco & Presley, as well as Joseph Iacopino and Michael Goch (collectively, attorneys or civil suit attorneys).

The employees also filed workers' compensation cases. In those proceedings, the employees were represented by Margaret Presley, also with Picco & Presley. Because the wives' claims for loss of consortium were not compensable through workers' compensation, they sought relief only in the civil suit.

The *Bechtel* plaintiffs retained Cranford Scott, M.D., as a medical expert. For the workers' compensation cases, Dr. Scott performed physical examinations and medical tests on the employees. He provided written reports to Presley, outlining each employee's work history and assessing whether the employee had any diseases that might be associated with working at Elk Hills. In his practice, Dr. Scott would sometimes recommend that an employee see a specialist to obtain additional support for a workers' compensation claim.

Some of the Elk Hills employees suffered from memory impairment, cognitive dysfunction, numbness, or dizziness, leading Dr. Scott to conclude that a neurological evaluation was appropriate. In that regard, he had lunch with Richard J. Perrillo, a neuropsychologist, and mentioned that the Elk Hills employees might benefit from his involvement. Later, Dr. Scott recommended that Attorney McGruder have Dr. Perrillo examine the employees. When Dr. Scott was asked at trial, "So every person that you referred over to Dr. Perrillo's office was strictly for workers' compensation cases," he answered, "That is correct."

Dr. Scott also participated in preparing summaries of his workers' compensation reports for submission in the civil suit. The summaries, commonly

called physician statements, were drafted in large part by the civil suit attorneys, but Dr. Scott would review and sign them.

From the outset, Dr. Scott understood he would be paid through the workers' compensation system, not the civil suit, for the services he provided to the employees. In Dr. Scott's words, "[W]hen you see workers' comp. patients, you only get paid once. . . . You submit a bill to workers' comp. . . . [¶] You are not supposed to get paid by the civil [suit] if you get paid by workers' comp."

Dr. Scott knew that the payment arrangement for the wives would be different because they had no workers' compensation cases. He evaluated them on a "personal injury basis." To get paid with respect to the wives, Dr. Scott had each one sign a "civil lien," which, as of 1998, provided in part: "To Attorney: [¶] I hereby authorize and direct you, my attorney to pay directly to said doctor such sums as may be due and owing him for medical service rendered me both by reason of this accident and by reason of any other bills that are due his office . . . and to withhold such sums from any settlement, judgment or verdict which may be paid to you, my attorney, or myself as a result of the injuries for which I have been treated or injuries in connection therewith.

"I fully understand that I am directly and fully responsible to said doctor for all medical bills submitted by him for service rendered and that this agreement is made solely for said doctor's additional protection and in consideration of his awaiting payment. I further understand that such payment is not contingent on any settlement, judgment, or verdict by which I may eventually recover said fee." Each lien was signed by the wife and McGruder.

In the spring of 1998, McGruder called the director of Dr. Perrillo's office, Keith Whiteman. She explained that her firm was working on a case involving a number of patients, mostly men, who had been exposed to chemicals in the process of cleaning oil wells. Some of their wives had been harmed through secondary exposure, primarily through contact with the men's clothing. McGruder said there might be a workers' compensation component to the litigation. She wanted Dr. Perrillo to serve as an expert. Whiteman replied that Dr. Perrillo did not take workers' compensation cases but would be happy to prepare the paperwork so the patients could use it in both the civil suit and the workers' compensation cases. Whiteman knew that it would be difficult to get paid "up front" and that Dr. Perrillo would have to take a civil lien. He said he would talk to Dr. Perrillo about taking the case.

Whiteman relayed this information to Dr. Perrillo, who then spoke directly with McGruder. They discussed the civil suit and the workers' compensation

cases. Perrillo said he would do a neuropsychological profile on the men and a psychological profile on the women. The profile for the men would cost approximately $5,000 to $7,000, and for the women, around $3,000. Perrillo wanted to know if he could be paid in advance. McGruder said she would have to check on it. Perrillo said if that were not possible, he would take a workers' compensation lien (or, more precisely, a "Notice and Request for Allowance of Lien") and a civil lien. Perrillo commented that taking both liens "protects my office." He recommended that an epidemiological study be done in the civil suit to show causation. The study was never undertaken.

McGruder asked Dr. Perrillo to write a report on each person he examined. She mentioned that some of the reports would have a workers' compensation aspect. Dr. Perrillo said he "was not interested in doing workers' comp." McGruder said he would be paid out of the civil suit settlement and that he would have a civil lien on the case.

The civil suit attorneys decided as a group to retain Dr. Perrillo and that he would have a civil lien and a workers' compensation lien. He would not be paid in advance. From Dr. Perrillo's perspective, he "was hired for the civil case." As he stated: "There was absolutely no question about it. They were going to pay me out of the settlement . . . . They knew that I was a civil expert." Dr. Perrillo did not expect to get paid out of workers' compensation. When asked at trial why he needed a workers' compensation lien, he answered, "I wanted to make sure that I was protected all the way around." And McGruder told him to obtain workers' compensation liens.

Dr. Perrillo decided to do "what was necessary to protect the patients" in the workers' compensation system, namely, draft a report that would comply with workers' compensation requirements so it could be used in both the civil suit and the workers' compensation cases. As Dr. Perrillo explained at trial, "We only do it and incur the expense to protect the patient." He did not feel he could "leave the patient hanging dry" given that "the patient can collect in both forums."

Dr. Perrillo did not go unchallenged in this regard. McGruder testified that Perrillo was retained solely for the workers' compensation cases, he was not supposed to evaluate any of the wives, and he was to have a lien only in the workers' compensation cases. McGruder said she told Perrillo he could not have a civil lien.

Beginning in May 1998, Dr. Perrillo examined approximately 40 male employees and 21 wives. Before they were examined, each of the *Bechtel* plaintiffs signed a civil lien entitled, "Notice of Doctor's Lien," which stated in part: "ATTORNEY: [¶] I hereby authorize and direct you, my attorney, to

pay directly to said doctor such sums as may be due and owing Richard J. Perrillo, Ph.D. for medical/psychological services rendered me by reason of this accident/injury and by reason of any other bills that are due [his] office and to withhold such sums from any settlement, judgment or verdict as may be necessary to adequately protect said doctor. And I hereby further give a lien on my case to said doctor against any and all proceeds of any settlement, judgment, or verdict which may be paid to you, my attorney, or myself as the result for the injuries for which I have been treated or injuries in connection therewith.

"I further understand that I will be held responsible for all collection costs, arbitrations, and/or legal fees used to recover said doctor's bills. . . .

"I fully understand that I am directly responsible to said doctor for all medical bills submitted by the office of [Dr. Perrillo] for services rendered me and that this agreement is made solely for the said doctor's additional protection and in consideration of [his] awaiting payment. And I further understand that such payment is not contingent on any settlement, judgment or verdict by which I may eventually recover said fee."

Dr. Perrillo did not discuss the language of the lien provisions with the civil suit attorneys. Although the liens contained a signature line for one of the attorneys, Perrillo never sent the liens to the attorneys for signature. Nor did any of the attorneys sign the liens. The attorney's signature line was prefaced as follows: "ACKNOWLEDGMENT OF ATTORNEY [¶] The undersigned being attorney of record for the above patient does hereby agree to observe all the terms of the above and agrees to withhold such sums from any settlement, judgment or verdict as may be necessary to adequately protect Richard J. Perrillo, Ph.D." There was no signature line for Dr. Perrillo, and he did not sign the liens either.

In addition to the civil liens, the employees signed a "Notice and Request for Allowance of Lien"—an official workers' compensation form—requesting that the amount of Dr. Perrillo's bill be deducted from their respective workers' compensation recoveries. (For convenience, we refer to those requests as workers' compensation liens.)

To prepare the medical reports in accordance with workers' compensation requirements, Dr. Perrillo retained a workers' compensation assistant, Kathryn Greve, whom he paid on an hourly basis. All of the reports on the employees used the same format. Each one was addressed to Dr. Scott. The opening paragraph began: "To whom it may concern this Med-Legal report qualifies for a ML 104—Extraordinary circumstances . . . designation because it is a comprehensive medical-legal evaluation involving extraordinary circumstances performed by me." Under workers' compensation regulations,

medical-legal reports are coded 101 through 104, depending on the complexity of the evaluation. (See Cal. Code Regs., tit. 8, § 9795.) By using an ML 104 code, Dr. Perrillo indicated that his reports were the most complex within the meaning of the regulations and that he should be paid the highest possible fee. (See *ibid.*) At the end of each report, Dr. Perrillo stated he had complied with Labor Code section 139.3, a workers' compensation statute that prohibits a physician from referring a person to a health care provider with whom the physician has a financial interest. He also signed the report under penalty of perjury, using the standard paragraph required in workers' compensation reports. (See § 4628, subd. (j).)

For each of the *Bechtel* plaintiffs, Greve prepared an itemized bill that indicated the medical tests conducted, the length of the examination, the time spent preparing the report, and the cost of each item. The last paragraph of the bill stated: "In accordance with the case of Federal Mogul [Corp.] v. WCAB (Whitworth) [1973] 38 [Cal.Comp.Cases] 584, and . . . [CNA Insurance Cos.] v. WCAB (Valdez) (1997) 62 [Cal.Comp.Cases] 1145, we will expect full reimbursement of our usual and customary charges, as billed . . . ." The bills complied with workers' compensation formalities. (See § 4626; Cal. Code Regs., tit. 8, § 9794.)

Finally, as to the employees, Dr. Perrillo completed a workers' compensation form entitled, "Doctor's First Report of Occupational Injury or Illness," which identified the employer, the workers' compensation carrier (carrier), the "accident or exposure," the employee's "subjective complaints," and the diagnosis. The "Doctor's First Reports" were sent to the appropriate carriers.

In 1999, after Dr. Perrillo completed his written work, he entered the amount of the bill on each workers' compensation lien, and sent the completed liens, medical reports, and itemized bills to the carriers and the Workers' Compensation Appeals Board (WCAB). He filed a lien in each of the workers' compensation cases. In response, he received offers of payment from some of the carriers and accepted payments on behalf of three employees (Messrs. Johnson, Rodgers, and Yingst).[1] Dr. Perrillo's reports were not submitted in the civil suit.

In 2000, the civil suit attorneys and Presley, the workers' compensation attorney, tried to reach a global settlement of the civil suit and the workers' compensation cases. The civil suit attorneys deliberately did not inform

---

[1] Our review of the record shows that McGruder informed some of the carriers in advance that Dr. Perrillo would be examining certain employees, and she subsequently sent the medical reports to those carriers. On appeal, the parties do not mention these facts or discuss their legal significance, if any. We therefore do not consider the point. (See *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237 [118 Cal.Rptr.2d 313].)

opposing counsel that Dr. Perrillo had evaluated the *Bechtel* plaintiffs, but Bechtel learned about his involvement through the workers' compensation proceedings. Bechtel subpoenaed Dr. Perrillo's records through the civil suit. Presley asked Dr. Perrillo to send a copy of the records to her so she could review them before the production. The records were copied and delivered around March 17, 2000. After reviewing them, Presley called Perrillo's office to say she was missing some of the civil liens, and they were sent to her.

On May 16, 2000, a three-day settlement conference began. Very few of the carriers attended. Bechtel made an offer. It was rejected. The conference ended without a settlement.

Presley immediately started reviewing Dr. Perrillo's reports, Dr. Scott's reports, and other medical records to develop disability ratings for the employees, hoping to pressure the carriers into accepting a compromise. On May 23, 2000, Presley incorporated this work into letters to the carriers, explaining why they should settle.

On one occasion, Presley commented that Dr. Perrillo's work had also been helpful in attempting to settle the civil suit because his reports were "driving home the civil matters." In early 2000, Presley informed Dr. Perrillo's office that "we've got $20 million on the table." Around the same time, the *Bechtel* plaintiffs made a global settlement demand of $16 million. By May 2000, however, their demand had dropped to $4.5 million. On or about August 7, 2000, the *Bechtel* plaintiffs accepted Bechtel's offer to settle the civil suit alone for $1.5 million. By that time, eight of the *Bechtel* plaintiffs had been involuntarily dismissed from the case for failure to comply with a court order; another refused to participate in the settlement. Bechtel did not offer any settlement money for the wives. The workers' compensation cases remained active.

Presley contacted Dr. Perrillo to see if he would give up his civil liens in light of the low settlement amount. She said he could seek payment for the *employees* through workers' compensation. Later, the civil suit attorneys offered to guarantee Dr. Perrillo 75 percent of his bills for the employees if he were awarded less than that percentage through workers' compensation or if the workers' compensation proceedings were not resolved in one year. The attorneys also offered to pay him $53,000 out of the settlement for his work on behalf of the *wives* and *one employee*, Phillip Cranfill, who did not have a workers' compensation case. Dr. Perrillo rejected this proposal in its entirety and insisted on receiving payment out of the settlement for *all* of the *Bechtel* plaintiffs. This dispute was not resolved. Dr. Perrillo did not accept any money from the settlement. The $53,000 is still being held in trust for him.

The civil suit attorneys took their share of the settlement funds first—"off the top"—and then distributed the remaining proceeds. Dr. Scott was paid $48,000 for his work on behalf of the wives and for the preparation of the physician statements in the civil suit. The employees received various amounts. The wives did not receive anything.

The workers' compensation cases went forward on an individual basis. For example, Dr. Perrillo had filed a workers' compensation lien seeking $6,350 in the case of Shane Irvine. By letter dated May 9, 2001, the carrier contested that amount, claiming the bill was too high. The carrier offered $1,900 to settle the lien. Dr. Perrillo rejected the offer and chose to submit the dispute to the WCAB. Presley and Greve (Dr. Perrillo's workers' compensation assistant) appeared at a hearing before a workers' compensation judge (WCJ) and convinced the carrier to offer $5,500—87 percent of the bill. Greve called Dr. Perrillo, who agreed to accept that amount. Greve and Presley then appeared before the WCJ to obtain an order resolving the lien.

Afterward, Dr. Perrillo spoke with the civil suit attorneys about collecting the $850 balance on the Irvine lien. Perrillo was told that the WCAB had exclusive jurisdiction over the matter, and he could not recover any additional amount on the lien from any source. Based on that conversation, Perrillo withdrew all of his other workers' compensation liens and did not accept any more payments through the system.

On September 14, 2000, Dr. Perrillo filed this action against Picco & Presley, Gregory Picco, Joseph Iacopino, and Margaret Presley. Eileen McGruder was not sued. Michael Goch was sued but settled for $50,000 in the fall of 2002. (We now include Presley and exclude McGruder and Goch in using "attorneys" and "civil suit attorneys.") The original complaint alleged that the civil suit attorneys had refused to pay Dr. Perrillo for his services in the *Bechtel* suit, contrary to the terms of the civil liens.

The complaint was amended on two occasions. The second amended complaint, filed on August 21, 2003, alleged 10 causes of action, including conversion, breach of fiduciary duty, and intentional interference with con-tractual relations. It alleged, as before, that the civil suit attorneys had not paid Dr. Perrillo's bills in accordance with the civil liens. As relief, Dr. Perrillo sought damages in the amount of the liens, prejudgment interest, general and punitive damages, and an award of attorney fees. He sought relief based on the services he had provided to the 60 *Bechtel* plaintiffs, which did not include Shane Irvine.

During law and motion proceedings, the civil suit attorneys twice moved for summary adjudication based on the exclusive remedy doctrine, arguing

that Dr. Perrillo could not recover anything from them as to the employees. The trial court denied the motions, finding triable issues of fact. The exclusive remedy issue was also raised, but not resolved, by way of trial briefs and in limine motions. (For purposes of our discussion, "employees" excludes Mr. Cranfill, who did not file a workers' compensation case.)[2]

Before the present case was tried, 32 of the approximately 39 workers' compensation cases had ended in settlements favoring the employees and orders by a WCJ that the carriers resolve all physician liens, including Dr. Perrillo's. With the exception of Dr. Perrillo, the other doctors in the workers' compensation cases accepted the resulting lien payments.

In June 2004, on the eve of trial, Dr. Perrillo sought leave to amend the operative complaint to add a cause of action for breach of contract, alleging that the civil suit attorneys had agreed to pay him out of the settlement in the civil suit and had breached that promise. At the close of Dr. Perrillo's case, the trial court granted the motion to amend.

The attorneys moved for nonsuit on the basis of workers' compensation exclusivity. The trial court denied the motion, stating: "I think the real issue in this case is whether . . . or not Dr. Perrillo was hired for the civil case or not. . . . If he was, then I think the jurors have to determine what work he did on the civil case, and determine if he's entitled [to] compensation. [¶] If they find he was not hired for the civil case, if they find the lien is not valid, the only recourse is through the workers' compensation avenue."

After both sides rested, the jury was instructed. On July 26, 2004, the jury returned a special verdict, finding the civil suit attorneys liable for breach of contract, conversion, intentional interference with contractual relations, intentional breach of fiduciary duty, and negligent breach of fiduciary duty. The jury found that the civil suit attorneys had entered into a valid contract with Dr. Perrillo to pay for his services out of the civil settlement. It awarded him $307,146.59 in past economic losses—the exact amount he had requested for the unpaid bills plus $837.49 in photocopy expenses incurred in responding to Bechtel's subpoena in the civil suit.

The trial court reduced the verdict by Goch's $50,000 settlement payment. On January 3, 2005, judgment was entered for $257,146.59, plus prejudgment interest of $80,802.36, calculated at 7 percent, for a total of $337,948.95. On motion, the trial court awarded Dr. Perrillo $557,182.50 in attorney fees

---

[2] The parties do not say why Cranfill did not seek workers' compensation. For all we know, he was not entitled to do so. The civil suit attorneys do not argue that the exclusivity doctrine applies to him. We accept that concession.

against the civil suit attorneys pursuant to the fee provision in the civil liens. An order to that effect was entered on April 21, 2005.

The civil suit attorneys appealed from the judgment and the order awarding attorney fees. Dr. Perrillo filed a cross-appeal regarding the award of prejudgment interest and attorney fees.

# II

# DISCUSSION

The civil suit attorneys argue that Dr. Perrillo's services for the employees are compensable only through the workers' compensation system, notwithstanding any contracts or civil liens, because (1) he submitted his reports, itemized bills, and workers' compensation liens to the carriers and the WCAB; (2) he accepted payments from the carriers as to some employees; (3) he resolved a disputed bill in connection with a hearing before a WCJ; and (4) he refused to accept additional payments ordered by a WCJ who presided over the settlement of most of the workers' compensation cases. For the reasons that follow, we agree that the exclusive remedy doctrine applies. As a consequence, the judgment must be reduced by the amount the jury awarded Dr. Perrillo for the bills covering the employees.

Further, the civil suit attorneys are still holding $53,000 in trust to cover the services Dr. Perrillo rendered to the *Bechtel* plaintiffs who *did not have* workers' compensation cases, namely, the wives and Mr. Cranfill. The jury awarded Dr. Perrillo the full amount of the bills for those individuals too. But some of the wives were involuntarily dismissed from the civil suit before it settled because they failed to comply with a court order. The judgment must be further reduced to reflect those dismissals.

Finally, we find no basis for awarding attorney fees against the civil suit attorneys. The trial court relied on the attorney fees provision in the civil liens, which were executed by the *Bechtel* plaintiffs. The signature line for the attorneys was never signed. We cannot say that the civil suit attorneys agreed to the attorney fees provision, either expressly, impliedly or by word or deed. The award of attorney fees was in error.

We agree with Dr. Perrillo, however, that the trial court did not err by permitting the amendment of the operative complaint to add a breach of contract claim. Nor was the new claim barred by the parol evidence rule or the statute of limitations. And substantial evidence supported the jury's determination that the civil suit attorneys breached an oral contract to pay Dr. Perrillo out of the settlement.

We remand the case to the trial court so that, consistent with our opinion, it may redetermine the amount of the judgment in the first instance.

## A. Workers' Compensation Exclusivity

■ The California Constitution gives the Legislature "plenary power . . . to create, and enforce a complete system of workers' compensation." (Cal. Const., art. XIV, § 4.) In turn, the Legislature enacted the Workers' Compensation Act (Act) (§ 3200 et seq.).

Under the Act, the WCAB has *exclusive jurisdiction* over all proceedings "[f]or the recovery of *compensation*, **or** concerning any right or liability *arising out of or incidental* thereto." (§ 5300, subd. (a), italics & boldface added.) "Compensation" includes medical-legal expenses. (See *Adams v. Workers' Comp. Appeals Bd.* (1976) 18 Cal.3d 226, 231 [133 Cal.Rptr. 517, 555 P.2d 303]; §§ 3207, 4064, subd. (a), 4620.) "[A] medical-legal expense means any costs and expenses incurred by or on behalf of any party . . . for X-rays, laboratory fees, other diagnostic tests, medical reports, [and] medical records . . . for the purpose of proving or disproving a contested claim." (§ 4620, subd. (a).)

■ In addition, the payment of a physician for rendering medical-legal services *arises out of or is incidental* to the employee's right to compensation. (See *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 807–808, 815–816 [102 Cal.Rptr.2d 562, 14 P.3d 234] (*Vacanti*).) The physician has a lien under the Act for medical-legal services and may appear as a lien claimant before the WCAB. (§ 4903, subd. (b); *Fox v. Workers Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1196, 1203–1207 [6 Cal.Rptr.2d 252].)

"[A] lien claimant's right to medical-legal costs [is] derivative of the employee's rights." (*Beverly Hills Multispecialty Group, Inc. v. Workers' Comp. Appeals Bd.* (1994) 26 Cal.App.4th 789, 803 [32 Cal.Rptr.2d 293].) "Therefore, [medical-legal lienholders] stand in the place of the employees with respect to claims for workers' compensation benefits, and [their] rights cannot exceed employees' rights. Because employees are limited to [the Act's] remedies for *all* injuries caused by . . . refusals to pay [them] . . . , [the lienholders] are limited to the same." (*Vacanti, supra,* 24 Cal.4th at p. 816, citations omitted.) "The mere fact that plaintiffs are medical providers, and not employees, does not preclude the application of [the exclusive remedy] provisions." (*Id.* at pp. 815–816.)

"[C]laims seeking compensation for services rendered to an employee in connection with his or her workers' compensation claim fall under the

exclusive jurisdiction of the WCAB." (*Vacanti, supra,* 24 Cal.4th at p. 815.) "The WCAB has exclusive jurisdiction over workers' compensation *medical liens*. . . . It is the only body authorized to consider such disputes . . . ." (*Hand Rehabilitation Center v. Workers' Comp. Appeals Bd.* (1995) 34 Cal.App.4th 1204, 1214 [40 Cal.Rptr.2d 734], citations omitted, italics added.) Accordingly, the exclusivity doctrine applies to a lien dispute between a physician and an employee's attorney over medical-legal services rendered in a workers' compensation case. (See *Workmen's Comp. Appeals Bd. v. Small Claims Court* (1973) 35 Cal.App.3d 643, 645–647 [111 Cal.Rptr. 6] [physician is barred from maintaining civil action against attorney to recover expert witness fee for testifying in workers' compensation case]; *id.* at p. 646 & fn. 4, citing § 4903, subd. (b) & former § 4600, now § 4620, subd. (a) [liens for medical-legal expenses include cost of expert testimony].)

■ Physicians may not charge more than a reasonable amount for their services, as determined by the WCAB's fee schedule or in a WCAB hearing. (See §§ 4903, subd. (b), 4903.5, 4904, 4906, subd. (a), 4622, subd. (c), 4625, subd. (b), 5307.6, subds. (a), (b), (d)(1); *Beverly Hills Multispecialty Group, Inc. v. Workers' Comp. Appeals Bd., supra,* 26 Cal.App.4th at p. 803; Cal. Code Regs., tit. 8, § 9794, subd. (c); see also *Boehm & Associates v. Workers' Comp. Appeals Bd.* (2003) 108 Cal.App.4th 137, 148–152 [133 Cal.Rptr.2d 396].) By statute, "[t]he administrative director shall adopt and revise a fee schedule for medical-legal expenses . . . which shall be prima facie evidence of the reasonableness of fees charged for [such] expenses . . . . [¶] . . . [¶] . . . No provider may request nor accept any compensation, including, but not limited to, any kind of remuneration, discount, rebate, refund, dividend, distribution, subsidy, or other form of direct or indirect payment, whether in money or otherwise, from any source for medical-legal expenses if such compensation is in addition to the fees authorized by this section." (§ 5307.6, subds. (a), (d)(1); see Cal. Code Regs., tit. 8, §§ 9794, 9795.)

■ Further, "[n]o charge, claim, or agreement . . . for [medical-legal] expense[s] . . . is enforceable, valid, or binding in excess of a reasonable amount. The [WCAB] may determine what constitutes a reasonable amount." (§ 4906, subd. (a); see Cal. Code Regs., tit. 8, § 9794, subd. (c).) A WCJ may be appointed to determine a lien dispute. (§§ 5309, 5310.) A lien claimant who is aggrieved by an initial lien determination may petition the WCAB for reconsideration (§ 5900) and, if still dissatisfied, may seek judicial review (§ 5950).[3]

---

[3] An employer that pays medical-legal expenses is not always without a remedy. Where the employee has brought a civil action against a third party, the employer may file a lien in that action to recover the compensation it has paid. (§§ 3852, 3856, subd. (b).) If the civil suit has already concluded, resulting in a judgment or settlement in the employee's favor, the employer may seek a credit in the workers' compensation proceedings. (§ 3861.)

■ "A finding of industrial injury is not necessary for an award of medical-legal costs." (*Beverly Hills Multispecialty Group, Inc. v. Workers' Comp. Appeals Bd., supra*, 26 Cal.App.4th at p. 802; see *id.* at p. 802, fn. 19 [discussing prior version of Act]; accord, *American Psychometric Consultants, Inc. v. Workers' Comp. Appeals Bd.* (1995) 36 Cal.App.4th 1626, 1631, fn. 1 [43 Cal.Rptr.2d 254] [medical-legal expenses are generally payable by employer or carrier, whether claim is proved or not, unless employee gave false medical history to examining physician]; *Public Employees' Retirement System v. Workers' Comp. Appeals Bd.* (1978) 87 Cal.App.3d 215, 223 [151 Cal.Rptr. 35] ["an unsuccessful claimant for workers' compensation benefits may recover medical-legal costs"].)

"In accordance with the rules of practice and procedure of the [WCAB], the employee . . . shall be reimbursed for his or her medical-legal expenses . . . reasonably, actually, and necessarily incurred . . . ." (§ 4621, subd. (a).) "[T]he clear purpose of allowing reimbursement of [medical-legal] costs is to enable an applicant to secure expert professional services to establish the validity of a disputed claim and to ensure payment for such services—irrespective of the risks of the litigation or the financial condition of the applicant." (*Public Employees' Retirement System v. Workers' Comp. Appeals Bd., supra*, 87 Cal.App.3d at p. 223.) Thus, as recognized by the WCAB, an employer is required to pay an employee's medical-legal expenses even if the statute of limitations bars the workers' compensation claim (*Anchor Glass Container v. Workers' Comp. Appeals Bd.* (1995) 60 Cal.Comp.Cases 873, 874), the employee withdraws the claim (*Rockwell International, Inc. v. Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 24), or the WCAB determines that the employee's injury is not covered by workers' compensation (*Chevron Texaco Products Co. v. Workers' Comp. Appeals Bd.* (2003) 68 Cal.Comp.Cases 765, 767).[4]

■ There are, however, at least three statutory limitations on the employer's obligation to pay medical-legal expenses. First, the "[c]osts of medical evaluations, diagnostic tests, and interpreters incidental to the production of a medical report do not constitute medical-legal expenses unless the medical report *is capable* of proving or disproving a disputed medical fact, the determination of which is essential to an adjudication of the employee's claim for benefits." (§ 4620, subd. (c), italics added.) Dr. Perrillo does not dispute the capability of his reports. Nor does he mention this statute or discuss its effect. Second, as stated, medical-legal expenses must be "reasonably, actually, and necessarily incurred." (§ 4621, subd. (a).) Consequently, an

---

[4] Decisions of the WCAB, as reported in California Compensation Cases, have no binding effect on the courts but are entitled to deference unless clearly erroneous. (See *Ralphs Grocery Co. v. Workers' Comp. Appeals Bd.* (1995) 38 Cal.App.4th 820, 827, fn. 7, 828 [45 Cal.Rptr.2d 197]; *City of Long Beach v. Workers' Comp. Appeals Bd.* (2005) 126 Cal.App.4th 298, 316, fn. 5 [23 Cal.Rptr.3d 782].)

employer does not have to pay those expenses where an employee obtains a medical report through fraud. (See *Beverly Hills Multispecialty Group, Inc. v. Workers' Comp. Appeals Bd., supra,* 26 Cal.App.4th at pp. 802–803.) The fraud exception is not relevant in this case. Finally, the Act limits the *types* of covered medical-legal expenses to the "direct charges for the physician's professional services," including overhead and the cost of laboratory examinations, diagnostic studies, medical tests, and the clerical work necessary to produce the medical report. (§ 4628, subd. (d); see *id.,* subd. (e); *Ameri-Medical Corp. v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1260, 1264–1266, 1282–1284 [50 Cal.Rptr.2d 366].) The type of expenses is not an issue here.

Based on the foregoing authorities, we conclude that Dr. Perrillo's services for the employees are compensable solely within the workers' compensation system. Notwithstanding Dr. Perrillo's testimony that he "was not interested in doing workers' comp.," his services ultimately fell into that category. His medical reports, itemized bills, workers' compensation liens, and Doctor's First Reports of Occupational Injury or Illness were prepared in compliance with workers' compensation requirements or on workers' compensation forms. Those documents were sent to the carriers, the WCAB, or both. Dr. Perrillo accepted payments from some of the carriers and resolved one of his disputed liens in connection with a hearing before a WCJ. That he declined to accept additional lien payments from the carriers when the workers' compensation cases subsequently settled is of no avail to him.

The present action seeks "compensation" within the meaning of the Act, namely, a physician's recovery for providing medical-legal services. (§ 4620, subd. (a).) The WCAB has exclusive jurisdiction over such proceedings. (§ 5300, subd. (a).) In addition, the payment of medical-legal expenses arises out of or is incidental to the *employees'* recovery of compensation. The WCAB is the only forum empowered to adjudicate the right to such payment. (*Ibid.*)

As one court explained in a civil suit brought by a group of physicians seeking payment from injured employees for medical treatment: "[The plaintiffs] have undertaken to treat industrially injured patients, *to submit reports and billing statements to the employers' insurance carrier,* and *to accept payment from that carrier* at least as a credit against the employee's 'personal account.' *These facts demonstrate the attachment of the [WCAB's] jurisdiction* . . . . We see no distinction in substance between the physician's rendition of treatment and medical reports and the rendition of legal services by the claimants' attorney. Each is a necessary service rendered toward the realization of fundamental objectives of the Workers' Compensation Act. The Legislature has decreed that no agreement for either legal or medical services

in excess of a reasonable amount as determined by the Board is valid (§ 4906 . . .)." (*Bell v. Samaritan Medical Clinic, Inc.* (1976) 60 Cal.App.3d 486, 492 [131 Cal.Rptr. 582], citations omitted, italics added.)

■ It follows that whatever the nature of Dr. Perrillo's contract or lien with the civil suit attorneys or the *Bechtel* plaintiffs, the exclusive remedy provisions render it void and unenforceable. (See §§ 5300, subd. (a) [WCAB has exclusive jurisdiction over proceedings for recovery of "compensation"], 4906, subd. (a) [agreement to pay physician for medical-legal services is unenforceable if amount is in excess of that determined by WCAB], 5307.6, subds. (a), (d)(1) [no provider may accept compensation for medical-legal expenses in excess of fee schedule adopted by administrative director]; *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 540–542 [13 Cal.Rptr.3d 174] [discussing illegal contracts]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 451–455, pp. 492–497 [same].) " 'The rule is settled that the courts will not enforce a contract to perform an act prohibited by statute . . . .' " (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1127 [131 Cal.Rptr.2d 387]; accord, *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 127–138 [70 Cal.Rptr.2d 304, 949 P.2d 1] [attorney fees agreement is void to extent unlicensed attorneys practiced in California].)

■ Nor can Dr. Perrillo evade the exclusive remedy provisions simply by withdrawing his liens from the WCAB. That would exalt form over substance. (See Civ. Code, § 3528.) In *Vacanti, supra,* 24 Cal.4th 800, the physicians decided to forgo recovery on their workers' compensation liens and instead sought damages in a civil suit against several carriers. The Supreme Court held that the physicians could not circumvent the exclusivity doctrine and that their "causes of action [in the civil suit] do not fall outside the scope of the exclusive remedy provisions by virtue of the remedy they seek." (*Id.* at p. 816.) Similarly, an employee cannot avoid bringing a workers' compensation claim and instead file a civil suit by alleging the employer engaged in conduct that was unfair, outrageous, harassing, or intended to cause emotional harm resulting in disability. (*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 159–160 [233 Cal.Rptr. 308, 729 P.2d 743].) A civil action is barred despite such allegations. (*Ibid.*) Dr. Perrillo's rights are no greater than those of an employee. (See *Vacanti, supra,* 24 Cal.4th at p. 816.)

■ Nevertheless, Dr. Perrillo argues that he could not have been paid in the workers' compensation cases because each individual settlement, or "Compromise & Release," contained a *"Thomas* finding" (*Thomas v. Sports Chalet, Inc.* (1977) 42 Cal.Comp.Cases 625, 626–627, 632–633). Such a finding is required in a settlement to release an employer from liability for

*vocational rehabilitation*: The settlement must recite that there is a good faith issue which, if resolved against the employee, would defeat the employee's right to all workers' compensation benefits. (*Ibid.*; Cal. Code Regs., tit. 8, § 10870; 1 Cal. Civil Practice: Workers' Compensation (1993) Settlement, § 7.7, pp. 13–14; see also *Claxton v. Waters* (2004) 34 Cal.4th 367, 373 [18 Cal.Rptr.3d 246, 96 P.3d 496] [under *Thomas*, vocational rehabilitation services cannot be settled without specific findings].) A *Thomas* finding does not preclude or waive the recovery of medical-legal expenses. Indeed, the WCAB may resolve a medical-legal lien dispute *after* the approval of a settlement containing a *Thomas* finding. (See *Ameri-Medical Corp. v. Workers' Comp. Appeals Bd.*, *supra*, 42 Cal.App.4th at pp. 1267–1268 & fn. 6.) And, here, when the cases settled, a WCJ attempted to do just that, ordering the carriers to resolve all physician liens, including Dr. Perrillo's. But Perrillo would have nothing to do with it.

In applying the exclusivity doctrine, we are not concerned with the particulars of Dr. Perrillo's present claims against the civil suit attorneys. It is sufficient that each cause of action, however denominated, sought payment for the work Dr. Perrillo performed with respect to the workers' compensation cases. In essence, Dr. Perrillo withdrew his bills from the WCAB, placed them before the jury, and was awarded 100 percent of what he had not yet been paid. Where the " 'essence of the wrong' " is a lien dispute within the jurisdiction of the WCAB, " 'the [cause of] action is barred by the exclusiveness [doctrine] no matter what its name or technical form . . . .' " (*Vacanti, supra*, 24 Cal.4th at p. 813; see *Spratley v. Winchell Donut House, Inc.* (1987) 188 Cal.App.3d 1408, 1417 [234 Cal.Rptr. 121].) "In other words, the exclusivity provisions encompass all injuries 'collateral to or derivative of' an injury compensable by the exclusive remedies of the [Act]." (*Vacanti, supra*, at p. 813.)

Dr. Perrillo may have initially expected to serve as an expert in the civil suit, but he ended up providing medical-legal services in the workers' compensation cases. In that situation, the Act contemplates: (1) the physician will be paid solely through workers' compensation; (2) the WCAB will ensure that the physician's bills are not excessive; (3) the resulting payments to the physician will be made by the employer; and (4) the employer may file a statutory lien in the third party suit to recover what it paid. (See §§ 3852, 3856, subd. (b).) The Act does not, however, authorize a *physician* to file such a lien. Dr. Perrillo cannot recover in the workers' compensation cases *and* the civil suit, regardless of his desire "to make sure that [he] was protected all the way around." He must look solely to the workers' compensation system for payment even though his work may have been of some benefit in the civil suit.

Dr. Perrillo also contends that the exclusivity doctrine is inapplicable in light of section 3751, subdivision (b). Under that statute, "a provider of medical services shall not . . . collect money directly from the employee for services to *cure or relieve* the effects of the injury for which the claim form was filed, *unless* the medical provider has received written notice that liability for the injury has been rejected by the employer and the medical provider has provided a copy of this notice to the employee." (*Ibid.*, italics added.) Here, although the employers denied liability under the Act, Dr. Perrillo did not seek payment for "services to cure or relieve the effects of" the employees' injury. He evaluated the employees and filed written reports to support their workers' compensation claims. He was not a treating physician.

The same analysis applies to section 4605, which provides: "Nothing contained in this chapter shall limit the right of the employee to provide, *at his own expense*, a *consulting physician or any attending physicians* whom he desires." (Italics added.) Section 4605 appears among a series of statutes concerning the employer's obligation to pay for medical *treatment*. (See, e.g., §§ 4600, 4600.3, 4601–4603.5, 4610, 4610.1, 4616–4616.3.) Under those statutes, the employer may be entitled to select the injured employee's treating physician. (See, e.g., § 4600; *Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 165 [193 Cal.Rptr. 157, 666 P.2d 14].) If so, the employee is allowed a one-time change in physicians. (§ 4601, subd. (a).) And "[t]he employee is entitled, in any *serious case*, upon request, to the services of a *consulting physician* . . . at the expense of the employer." (*Ibid.*, italics added.)

"It is true that it is the duty of the employer of an injured employee to provide medical attention as well as surgical supplies, crutches, apparatus, nurses and medicines. It is, however, the right of the injured employee to refuse the assistance of a physician so supplied and to contract independently for a physician of his own choice and at his own expense." (*Credit Bureau of San Diego v. Johnson* (1943) 61 Cal.App.2d Supp. 834, 840 [142 P.2d 963].)

Section 4605 denies reimbursement for "self-procured medical *treatment*." (*Pacific Indem. Co. v. Industrial Acc. Com.* (1963) 220 Cal.App.2d 327, 331–333 [33 Cal.Rptr. 649], italics added; accord, *Christianson v. Industrial Acc. Com.* (1946) 11 Cal.Comp.Cases 278.) The statute "recognizes that any injured employee is free to seek *medical treatment and/or consultation* in addition to, or independent of, that for which his *employer is responsible.*" (*Bell v. Samaritan Medical Clinic, Inc., supra*, 60 Cal.App.3d at p. 490, italics added.) Here, the employees did not seek or receive treatment from Dr. Perrillo, nor was he chosen to serve as a treating consultant. He did nothing *in addition to or independent of* the services for which the *employers* were responsible. In fact, Dr. Perrillo filed his *medical reports and itemized*

bills with the WCAB, accepting the resulting payments from some of the carriers. A WCJ eventually ordered the carriers to resolve *all* of Dr. Perrillo's liens in the settled cases, but Perrillo declined to participate. In short, section 4605 ensures that employees are not forced to accept treatment or advice from a physician selected by the employer if they wish to go outside the workers' compensation system at their own expense.

For instance, an employee's intentional delay in having surgery—contrary to the view of the treating physician chosen by the employer—may relieve the employer of the cost of treatment and constitute an election by the employee under section 4605 to pay for the surgery himself. (*Gallegos v. Workmen's Comp. App. Bd.* (1969) 273 Cal.App.2d 569, 571–575 [78 Cal.Rptr. 157].) Similarly, where an employer initially chooses the treating physician, and, upon an employee's request for a change, the employer provides the names of other physicians, the employee may have to pay for her own treatment under section 4605 if she decides not to see any of the recommended physicians and instead goes to one of her own choosing. (See *Pacific Indem. Co. v. Industrial Acc. Com., supra,* 220 Cal.App.2d at pp. 328–331, 333–334.) And, in one case, where the wife of an injured employee retained a physician to perform surgery on her brain-damaged husband, saying it was a " 'private case,' " and she " 'would see to it that [the physician] was paid accordingly,' " section 4605 applied. (*Credit Bureau of San Diego v. Johnson, supra,* 61 Cal.App.2d at pp. Supp. 837, 839–841.)

Yet the analysis under section 4605 makes no sense as applied to medical-legal expenses. By definition, medical-legal expenses arise only in contested cases—where the employer disputes the employee's claim and *denies* benefits such as *medical treatment.* (See § 4620, subds. (a), (b).) In such circumstances, the employee retains a medical expert to prove his or her claim, not for treatment purposes. The *employer* does *not* get to choose the employee's expert. The employee does. And the employer is responsible for the expenses so incurred. (§ 4621, subd. (a); *American Psychometric Consultants, Inc. v. Workers' Comp. Appeals Bd., supra,* 36 Cal.App.4th at p. 1631, fn. 1; *Public Employees' Retirement System v. Workers' Comp. Appeals Bd., supra,* 87 Cal.App.3d at p. 223.)

Dr. Perrillo argues that because the employees *chose him* as their expert, they are personally liable to him under section 4605. His argument, if correct, would create an exception that would swallow the rule: Employees would always be liable for medical-legal expenses. We refuse to adopt this interpretation. That employees are permitted to choose their own medical experts in contested cases is grounded in fairness and common sense. The employer must pay for the employee's expert for the simple reason that, having contested the claim, the employer should not prevail just because the

employee cannot afford the professional services necessary to prove that the claim is valid. (See *Public Employees' Retirement System v. Workers' Comp. Appeals Bd., supra,* 87 Cal.App.3d at p. 223.)

We do not suggest that a physician cannot recover in a workers' compensation case and a related civil suit for services rendered separately in the two forums. For instance, Dr. Scott was paid through workers' compensation for his evaluation and reports on the employees, and he was paid out of the civil settlement for the physician statements—a different type of medical report—created for and filed in the civil suit. But when a physician's work culminates in documents that are submitted in support of a workers' compensation case, he or she must look exclusively to that forum for payment.

In sum, it does not matter that Dr. Perrillo may have been initially retained to provide advice in the civil suit or to be an expert in the civil suit. Nor is it relevant that he may have had a contract or lien with the attorneys or the *Bechtel* plaintiffs to be paid out of the proceeds of the suit. As a result of his subsequent *conduct*, Dr. Perrillo conferred exclusive jurisdiction upon the WCAB to determine *what* he was owed, and he limited his recovery to payment *from the employers* in the workers' compensation cases. Any agreement to the contrary is void and unenforceable. The judgment must therefore be reduced by the amount of the award for Dr. Perrillo's services to the employees. That figure is around $236,284.10, leaving approximately $20,862.49 in damages under the judgment.

B.–E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# III

## DISPOSITION

The January 3, 2005 judgment is reversed. On remand, the trial court shall reduce the judgment by the amounts the jury awarded for the services plaintiff rendered to (1) the employees who had workers' compensation cases and (2) the wives who were dismissed before the underlying suit settled. The trial court shall reconsider whether to award prejudgment interest and, if so, the amount. The April 21, 2005 order granting the motions for attorney fees

[*]See footnote, *ante,* page 914.

is reversed, and, on remand, the trial court shall enter an order denying those motions. Defendants are entitled to costs on appeal.

Vogel, J., and Jackson, J.,[*] concurred.

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.